UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIDEL SALGADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 18 C 8119 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| GRAHAM ENTERPRISE INC., ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Between 1993 and his termination in 2018, Plaintiff Fidel Salgado, who is Hispanic, worked for Defendant Graham Enterprise, Inc. in multiple positions, most recently as a general manager of gas stations. After his termination, Salgado filed this suit claiming that Graham Enterprise discriminated against him based on his national origin (Count I) and subjected him to a hostile work environment (Count II) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. The Court dismissed Salgado's hostile work environment claim at the pleading stage. Doc. 19. Upon the completion of fact discovery, Graham Enterprise has filed a motion for summary judgment on the remaining discrimination claim. Because Salgado has not raised an issue of fact as to whether his national origin caused his termination, the Court grants Graham Enterprise's motion for summary judgment.

## BACKGROUND[1]

Graham Enterprise owns and operates gas stations and car washes in northern Illinois. Patrick Graham and his three brothers own Graham Enterprise. Graham Enterprise began in

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts and the additional facts included in Salgado's response, to the extent they are appropriately presented, supported, and relevant to the resolution of the pending motion for summary judgment. All facts are taken in the light most favorable to Salgado, the non-movant.

1992 with one gas station and currently operates thirty-six locations. Graham Enterprise has approximately 500 employees, including four district managers and a general manager for each of its locations. In June 2015, Graham Enterprise hired Keyur Bhatt as its director of human resources. Bhatt standardized the operations and functions of the gas stations and created an employee handbook that sets out company policies. Graham Enterprise has also used a third-party consulting firm to create a customized training program for all of the company's employees.

Salgado, a Hispanic male who speaks both English and Spanish, worked for Graham Enterprise from November 1993 to March 2018. Graham Enterprise initially hired Salgado as a cashier at one of its gas stations, at which Salgado had worked prior to its acquisition by Graham Enterprise. Graham personally hired Salgado and initially directly supervised him as well. The two developed a friendship over the years when Salgado worked for Graham Enterprise.

In 1995, Graham Enterprise promoted Salgado from cashier to general manager. As general manager, Salgado's responsibilities included maintaining the cleanliness of the store, making sales, ensuring full staffing of the store, conducting inventory, and maintaining customer service. In 2002, Graham Enterprise promoted Salgado from general manager to district manager. But approximately six months later, Graham demoted Salgado to his prior general manager position. Salgado believes this demotion occurred because he had marital issues that affected his work.

Salgado worked at numerous Graham Enterprise locations during his time as general manager. He believes that Graham Enterprise assigned him to certain stores because he is Hispanic and bilingual. Salgado considered some of these locations, including the Forest View BP, Northlake BP, Oakbrook Terrace Mobil, and Rock 'n' Roll BP, to be in unsafe

neighborhoods. On several occasions while working at the Rock 'n' Roll BP, located in Chicago's River North neighborhood, Salgado contacted police with complaints of stealing and panhandling.

At some point, Clifford Scott became Salgado's supervisor and district manager. While at Graham Enterprise, Scott had twice promoted two Hispanic individuals, first to lead customer service representative and then to general manager. But Salgado recalled that, while under Scott's supervision, Scott directed several derogatory comments about Salgado's heritage to him. Specifically, Salgado testified that Scott asked him why he did not take the day off for Cinco de Mayo; commented during several meetings at Graham Enterprise's corporate office that "there's no Mexican food. We didn't order no Mexican"; and told Salgado on one occasion while he was in the bathroom during work hours, "you know you have a small pecker. You know, you Mexicans have a small pecker, so go out there – and it's like, go out there and work." Doc. 44 ¶ 16. Salgado never reported any of these comments to human resources, Brian Kapple, the operations manager, or Graham. He also never made a written complaint about discriminatory treatment, although he testified that he verbally complained about Scott's comments to several general managers, district managers, and cashiers.

In the two years prior to his termination, Salgado had several disciplinary issues, reflected in three written final warnings. Graham Enterprise does not typically provide employees three final warnings prior to termination and instead terminates employees sooner for violations of company policies. Bhatt and Scott gave Salgado his first final warning on April 12, 2016, which Salgado signed that day. The first final warning related to an incident at the Skokie Citgo store on March 30, 2016 that another employee reported to management. Bhatt reviewed video footage from that day, which shows a female former employee, Nelida Salgado, entering

3

the back office with Salgado after leaving her children unattended in a car parked in front of the store. Salgado then appears on the video intentionally moving a cardboard box in front of the surveillance camera in the back office.[2] Bhatt believes the two then engaged in sexual activity in the back office, which Salgado denies. Salgado knew that it was against company policy to have non-employees in the back office of the store.[3]

On May 6, 2016, Salgado received a disciplinary suspension without pay and probationary demotion based on two additional incidents that occurred on April 16 and April 27, 2016. On April 16, the writeup stated that a female non-employee and her three children visited Salgado at work, after which Salgado departed the store with them while still on the clock for approximately an hour and a half. When Salgado returned to the store, he continued to socialize with the female and her children until he clocked out. The writeup indicated that Salgado did not have authorization to leave the location or engage in personal business while on company time. On April 27, Scott gave Salgado permission to leave his store for one hour. Salgado remained absent from the store for over two hours. Upon reviewing video footage from that day, Bhatt observed that, upon Salgado's belated return to the store, he covered the camera in the back office and had a female join him there for approximately six minutes.[4] The video also showed

---

[2] Although Salgado denies tampering with the camera or blocking it intentionally, the Court has reviewed the video and finds that it clearly contradicts Salgado's account. "When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when that version is blatantly contradicted by the videotape." *Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

[3] The employee handbook provides: "Employees are expected to remain in their work area during working hours, and the visiting of friends or members of the family, is not allowed. Please remind your friends and relatives that unless there is an emergency involved, they should not disturb you while you are working." Doc. 44-5 at 41.

[4] This video footage did not exist by the time Salgado instituted this case.

Salgado return to the back office to uncover the camera about a half hour later. Based on his review of the video footage and discussions with Scott, Bhatt prepared the writeup, which was signed by Bhatt, Kapple, Scott, and Brian Wente, the vice president of marketing and operations. Salgado also signed the writeup, acknowledging that he understood his job was in "serious jeopardy" and that the writeup amounted to another final warning. Doc. 44 ¶ 57. Although he claims he did not have the opportunity to read the writeup and was instead told to sign it or face termination, Salgado recalls his suspension and demotion being for allegedly tampering with cameras at the store.

After the two-week suspension, Graham Enterprise reassigned Salgado to a customer service representative role at the Rock 'n' Roll BP. On Scott's recommendation, Graham Enterprise reinstate Salgado to the general manager position on December 7, 2016. Salgado served as a floating general manager until he received a placement at the Glen Ellyn BP. At some point, Graham Enterprise transferred him back to the Rock 'n' Roll BP as its general manager.

A little under a year after his reinstatement as general manager, on November 8, 2017, Salgado received a third final warning signed by Scott. The warning focused on instances Scott discovered of Salgado clocking in and out at the Forest View BP despite his assignment to the Rock 'n' Roll BP without permission between March and November 2017. Salgado testified that he clocked in and out at other locations because he visited those locations to obtain items for his store or to bring those locations needed items, such as cups and coffee lids. The third final warning also noted that Salgado had on one occasion failed to secure a large deposit and spent extensive time outside of his assigned store conducting personal business while on the clock. Salgado signed off on the third final warning, which indicated that, during a meeting with Scott

5

and Bhatt on November 3, Salgado "acknowledged and accepted that he had intentionally violated the above mentioned company policies sighting [sic] issues in his personal life. He acknowledged the fact that he had been conducting personal business while on company time and had punched in and out at unauthorize [sic] company site to account for his hours worked for the week." Doc. 44 ¶ 66. Salgado now disputes the third final warning's content and accuracy, although he acknowledges that falsifying time was grounds for termination. Graham Enterprise had previously terminated another general manager for falsifying time and Bhatt recommended that Graham Enterprise also terminate Salgado for this violation. Graham overrode Bhatt's recommendation because he wanted to provide Salgado with one last chance.

Salgado did not remain on the job much longer, however. On March 16, 2018, Graham Enterprise terminated Salgado. Graham Enterprise's bank contacted it to let it know that approximately $20 was missing from seven consecutive deposits from the Rock 'n' Roll BP. As general manager, it was Salgado's responsibility to count money each day for the store, although the lead cashier and Scott also had access to the Rock 'n' Roll BP's safe. Graham Enterprise asked Scott to investigate. Scott reviewed the Dunbar records, deposit slips, and video from the store. Scott confirmed from the video that Salgado was the only one who handled the deposits at issue, physically closing the bags, validating the deposit slips, and recording the deposit amounts in the Dunbar book.[5] When confronted with the short deposits at Graham Enterprise's corporate office on March 16, Salgado could not explain the inaccuracy. Having already given Salgado three final warnings, Graham Enterprise terminated Salgado for failing to protect company assets.[6] Bhatt, Kapple, Scott, and Wente all agreed to the termination. Although Graham still

---

[5] This video footage no longer exists.

[6] Graham Enterprise had also previously terminated a white male for failing to protect company assets who could not explain what had happened to a deposit.

considered Salgado an excellent employee, he also concurred with the ultimate termination decision. Bhatt testified that Salgado's national origin did not ever enter into the discussions about disciplining or terminating Salgado. Graham Enterprise replaced Salgado as general manager of the Rock 'n' Roll BP with a Hispanic female.

Salgado testified that he does not believe that Graham terminated him because he was Hispanic, noting that it would be "strange" for Graham to have done so given that Salgado had worked for the company for twenty-five years and Graham had twice promoted him. Doc. 44 ¶ 91. Instead, Salgado testified that he believes Graham Enterprise terminated him because he was accused of stealing and he was Graham Enterprise's most highly compensated general manager. In certain circumstances, Graham Enterprise's employee handbook allows for the rehiring of terminated employees,[7] but Graham indicated at his deposition that he would have to discuss whether Graham Enterprise would consider rehiring Salgado with his management team.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving

---

[7] Specifically, the employee handbook provides: "Whether an employee who terminates employment for any reason will be re-hired is at the sole discretion of management. Factors that will be taken into consideration in making a decision regarding re-hire include, but are not limited to: job openings, the employee's prior work performance, prior attendance record, whether the employee gave proper notice of termination, reason for termination, etc." Doc. 44-5 at 16.

party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ANALYSIS

### I.  Title VII National Origin Discrimination Claim (Count I)

Graham Enterprise argues that Salgado cannot prevail on his claim that Graham Enterprise terminated him because of his national origin in violation of Title VII. Title VII makes it an unlawful employment practice "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). Courts previously spoke of proceeding under an indirect or direct method to establish discrimination, but the Seventh Circuit has instructed that instead of using such tests, the Court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's [national origin] caused the discharge." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This does not mean that the Court cannot consider the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). But because Salgado clarifies in his response that he does not seek to use *McDonnell Douglas*' burden-shifting test to prove his claim, the Court only considers the

8

evidence as a whole in addressing whether a reasonable factfinder could find that Salgado's national origin caused his termination. *See id.* at 765–66.

Salgado may demonstrate causation through evidence of, for example, comments or animus toward his protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretextual reasons given for his termination. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). Graham Enterprises argues that Salgado has no evidence to demonstrate that his national origin caused his termination and that, instead, Salgado's failure to protect the company's assets, along with his prior documented violations, prompted his termination. Graham Enterprise even points out that, at his deposition, Salgado agreed that he did not believe Graham terminated him because he was Hispanic.

In response, however, Salgado focuses on Scott and his involvement in the termination decision, claiming that the decision was tainted by Scott's discriminatory animus toward Salgado.[8] Salgado points to his testimony identifying the derogatory comments Scott made to him about his Mexican heritage throughout the course of his employment as evidence of Scott's discriminatory animus. For such comments to establish discriminatory motivation, they must be "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone,

---

[8] Salgado argues that the Court should consider Scott's discriminatory animus regardless of whether he qualifies as a decisionmaking employee under the cat's paw theory, which allows an employer to be held liable where "a non-decision-making employee with discriminatory animus provided factual information or input that may have affected the adverse employment action." *Matthews v. Waukesha County*, 759 F.3d 821, 829 (7th Cir. 2014); *Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012) ("Our decisions teach that when a subordinate harbors a discriminatory animus and advises the ultimate decision-maker to take an adverse action against the plaintiff, that evidence can support a claim against the corporate employer."), *overruled on other grounds by Ortiz*, 834 F.3d 760. The Court does not find it necessary to address Salgado's cat's paw theory because the parties have agreed that Scott was one of the decisionmakers with respect to Salgado's termination.

biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."). Salgado has not provided any timeframe for when Scott made the derogatory comments nor does the record suggest any connection between the comments and Salgado's termination. *Cf. Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 285–86 (7th Cir. 2015) (emails of complaints about the plaintiff's military service, followed by discussions about disciplining plaintiff for other reasons, could allow the inference that her punishment for other minor infractions "was actually motivated by her supervisors' long-standing frustration about her frequent absences"); *Radentz v. Marion Cty.*, 640 F.3d 754, 759–60 (7th Cir. 2011) (expressed preference for replacing white employees with African Americans provided some support for the plaintiffs' claims that their termination was race-based). Without anything more, Scott's derogatory remarks do not create a question of fact with respect to whether Salgado's national origin caused his termination.

 Salgado also argues that questions of fact exist as to whether Graham Enterprise's stated reason for his termination was pretextual. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Salgado can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' his termination, or indirectly by showing that [Graham Enterprise's] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). In determining whether an employer's explanation is honest, courts look to the reasonableness of the explanation. *Duncan v. Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 492 (7th Cir. 2008); *see also Stewart v. Henderson*, 207 F.3d 374, 378 (7th

10

Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.").

Graham Enterprise proffers that it terminated Salgado for failing to protect company assets, a violation committed after Salgado received three written final warnings that put him on notice that his job was in serious jeopardy. The record indicates that Graham Enterprise gave Salgado more chances to keep his job than it typically gave employees, suggesting that Salgado received mercy over the years but ultimately wore out his welcome after repeated violations.

Salgado, however, claims that his long tenure at Graham Enterprise and his progression from a cashier to general manager support a finding of pretext. But Salgado's belief that he was meeting legitimate job expectations does not create a question of fact, particularly when considered in connection with Salgado's failure to provide any evidence that calls into question Graham Enterprise's investigation into the missing deposits. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017) ("Lauth's belief that he was performing his job adequately is not relevant to the question of whether Covance believed it had a legitimate, non-discriminatory basis to terminate him."); *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (the plaintiff could not create an issue of fact by claiming he was performing adequately or by challenging his supervisors' assessment of his performance). While Salgado may believe that his actions did not warrant termination, the Court does not sit as a "super personnel department that second-guesses employer's business judgments." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted); *see Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair.").

11

On the record before the Court, Salgado has not raised a question of fact as to whether his national origin caused his termination, and so the Court grants summary judgment for Graham Enterprise on Salgado's national origin discrimination claim. *See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016) ("Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus.").

## II. Salgado's Request to Amend the Complaint

In his response to the motion for summary judgment, Salgado argues that he may have a viable retaliation claim based on Graham's deposition testimony that he would likely not rehire Salgado. Salgado also seeks leave to amend his complaint to add a spoliation of evidence claim against Graham Enterprise for its failure to preserve certain surveillance camera videos that Bhatt and Scott reviewed and that contributed to the final warnings and termination decision. The Court does not find it appropriate to allow Salgado to belatedly assert these claims.

Rule 15(a)(2) provides that amendments to the pleadings are allowed "only with the opposing party's written consent or the court's leave" and instructs the Court to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This is a liberal standard that the Supreme Court has held "to require a district court to allow amendment unless there is a good reason—futility, undue delay, undue prejudice, or bad faith—for denying leave to amend." *Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357–58 (7th Cir. 2015) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). The standard for supplemental pleadings under Rule 15(d), regarding "events that happened after the date of the pleading to be supplemented," is largely the same. Fed. R. Civ. P. 15(d); *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996). The Court must consider "whether granting leave to file the supplemental pleading will 'promote the

economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the parties to the action.'" *Rundle v. Vill. of Round Lake Beach*, No. 99 C 5253, 2001 WL 1414532, at *14 (N.D. Ill. Nov. 13, 2001) (citing 6A Arthur Miller, Mary Kane, and Benjamin Spencer, Federal Practice & Procedure § 1504 (2d ed. 1990)).

The Court finds that adding Salgado's proposed retaliation claim would be futile. "If the amended claim would not survive a motion for summary judgment, the amendment is futile." *Sound of Music Co. v. Minn. Min. & Mfg. Co.*, 477 F.3d 910, 923 (7th Cir. 2007) (citing *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001)). Title VII prohibits retaliation against employees who engage in statutorily protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). To prevail on this claim, Salgado would have to establish that (1) he engaged in a statutorily protected activity, (2) he suffered a materially adverse action, and (3) a causal connection exists between the two. *Id.* For an action to qualify as materially adverse, "a plaintiff must show that the action would have 'dissuaded a reasonable worker from' engaging in protective activity." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901–02 (7th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Salgado claims that he has suffered a materially adverse action because Graham testified at his deposition that the company "is not comfortable extending re-employment to Salgado." Doc. 48 at 10. But Graham only testified that he was "not comfortable answering that question without . . . [his] team's involvement." Doc. 44-2 at 14. Nor has Salgado indicated that he has made any attempt at obtaining reemployment with Graham Enterprise or that Graham Enterprise's discriminatory practices deterred him from doing so. *See Johnson v. Chicago Bd. of Educ.*, No. 12 C 3670, 2018 WL 3208512, at *3 (N.D. Ill. June 29, 2018) ("To prevail on her failure-to-

13

rehire claim, Johnson must show that she actually applied for the position for which she was not hired, unless 'the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying.'" (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004))). Because the Court fails to see an actionable materially adverse action, the Court finds that amendment to add a retaliation claim would be futile and denies Salgado's request.[9] *See Daza v. State*, 331 F. Supp. 3d 810, 850 (S.D. Ind. 2018) ("Mr. Daza has not presented any evidence that he even re-applied for his position and was rejected and, even if he had, any evidence that his EEOC Charge factored into a decision not to re-hire him.").

    As for the spoliation of evidence claim, Salgado alleges that Graham Enterprise improperly destroyed surveillance videos from April 27, 2016 and February and March 2018. But Salgado does not contend that he only recently discovered that Scott and Bhatt reviewed these videos in the course of their investigation into Salgado's conduct or that these videos no longer exist. Instead, Salgado has known about these videos since before he initiated this litigation; the written warnings and the termination decision reference them, and the parties also addressed them in a hearing before the Illinois Department of Employment Security. Allowing Salgado to amend his complaint now to assert this claim would reward Salgado's undue delay and cause prejudice to Graham Enterprise. *See Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997) (amendment during summary judgment briefing after the close of discovery would be inefficient and unduly prejudice defendant). Graham Enterprise filed its summary judgment motion in reliance on the theories pleaded in Salgado's complaint and the evidence adduced during discovery. Because Salgado's attempt at asserting a spoliation claim comes too

---

[9] Additionally, to the extent Salgado claims that the basis for this claim only became apparent at Graham's deposition on January 28, 2020, the Court notes that Salgado had several opportunities to raise the potential for a retaliation claim with Graham Enterprise and the Court before Graham Enterprise filed its motion for summary judgment.

late, the Court also denies Salgado's request to add this claim. *See Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009) (district court did not abuse its discretion in denying leave to amend "late in the game" based on information "available long before [the plaintiff] sought leave to amend").

## CONCLUSION

For the foregoing reasons, the Court grants Graham Enterprise's motion for summary judgment [42]. The Court denies Salgado's request for leave to file an amended complaint to add retaliation and spoliation of evidence claims. The Court enters judgment for Graham Enterprise on Salgado's complaint and terminates this case.

Dated: September 14, 2020

                                              SARA L. ELLIS
                                              United States District Judge